UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
SHERYL J. THOMAS,                              :
                          Plaintiff,           :
v.                                             :          **OPINION AND ORDER**
                                               :
PAUL ARTETA and the COUNTY OF                  :          23 CV 2981 (VB)
ORANGE,                                        :
                          Defendants.          :
--------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Sheryl J. Thomas brings this action against defendants Paul Arteta and the

County of Orange, pursuant to 42 U.S.C. § 1983, for alleged unlawful retaliation against her in

violation of her First Amendment rights to free speech and association.  Now pending is

defendants' motion for summary judgment.  (Doc. #54).

      For the reasons set forth below, the motion is DENIED.

      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

      The parties have submitted briefs, declarations with supporting exhibits, and statements

of material facts pursuant to Local Civil Rule 56.1, which reflect the following factual

background.

I.     Plaintiff's Employment History with the Orange County Sheriff's Office

      In 2009, plaintiff started a Tea Party chapter in Orange County.  In 2012, she invited

then-Orange County Sheriff, Carl DuBois, to attend an event hosted by her Tea Party chapter.

Sheriff DuBois was unable to attend, so he sent Undersheriff Ken Jones in his place.  This was

the first time plaintiff and Jones met.  They met again several times the following year at Tea

Party events.

In 2013, plaintiff hosted a radio show on an online radio platform called BlogTalkRadio. Plaintiff invited Sheriff DuBois to appear on an episode about women getting handgun licenses, which addressed the lack of training opportunities geared towards women. Sheriff DuBois was unable to attend, so Jones called into the show instead. During the show, plaintiff and Jones discussed why the Sheriff's Office did not provide firearm training opportunities to civilians. Prompted by this discussion, after appearing on plaintiff's show, Jones spoke with Sheriff DuBois about creating a position in the Orange County Sheriff's Office ("OCSO") dedicated to civilian handgun training.

Subsequently, the Assistant Range Instructor position was created as a per diem position dedicated to civilian handgun training, and capped at nineteen hours per week. The position was approved by Sheriff DuBois, as well as the County Legislature, the County Executive's Office, the Budget Office, and Human Resources.

In late 2013, plaintiff began a romantic relationship with Jones.

Plaintiff was appointed to the newly created Assistant Range Instructor position, effective March 16, 2014. As Assistant Range Instructor, plaintiff was responsible for teaching courses on firearms safety and fundamentals. In addition, she oversaw the County's list of approved firearms instructors, managed a program qualifying retired law enforcement professionals to carry firearms across state lines, performed administrative functions, and supervised two deputies assigned to the range. Moreover, although it was not part of her job description, around this time plaintiff developed the Civilian Tactical Handgun Training Program (the "Civilian Training Program"), in coordination with Jones.

After more than four years as Assistant Range Instructor, plaintiff was provisionally appointed to the newly created position of Range Supervisor, on December 7, 2018. OCSO did

2

not hire a replacement Assistant Range Instructor after plaintiff's promotion to Range Supervisor. On December 22, 2020, plaintiff's position as Range Supervisor was made permanent and she became entitled to civil service protections.

As Range Supervisor, plaintiff retained her prior responsibilities as the Assistant Range Instructor, in addition to coordinating use of the range between agencies, undertaking vendor management, and overseeing budgeting and payroll. Plaintiff was afforded significant autonomy over her work schedule and had her own set of keys to the range.

In addition, plaintiff continued to administer the Civilian Training Program. Indeed, by the time she was appointed provisional Range Supervisor in 2018, the program had developed from a single course on firearm fundamentals for civilians into six different courses. In 2022, in compliance with the passage of new gun laws, the Civilian Training Program was collapsed into a single eighteen-hour course.

II.    <u>The 2022 Orange County Sheriff's Election</u>

Orange County Sheriff is an elected position, and elections for Sheriff occur every four years. Sheriff DuBois chose not to run for re-election in 2022, and both Jones and defendant Paul Arteta sought the Republican Party nomination. In anticipation of the June 2022 Republican primary election, both Jones and Arteta launched their campaigns in late 2021.

Plaintiff volunteered for Jones's campaign. She gathered petitions, made donations, and supported the Jones campaign on social media. In addition, throughout the Orange County Sheriff primary and general election season, plaintiff was the OCSO permanent Range Supervisor and administered the Civilian Training Program.

The Civilian Training Program played a role in both Jones and Arteta's primary campaigns. Arteta campaigned on giving "the [Civilian Training] [P]rogram a[n] overhaul with

the idea of giving more of the safety courses to certified instructors throughout the county."
(Doc. # 60-13 at ECF 2–3).[1]  In response, plaintiff took a video for Jones's campaign that was
posted online, implying Arteta's true intention was to "KILL the community [Civilian Training]
program!!"  (Doc. #55-14 at 2; Doc. #63 ¶ 19).  Subsequently, Jesse Dwyer, vice president of the
consulting firm Arteta retained to work on his campaign, posted a comment on the Jones
campaign video claiming Arteta planned to "fire [Jones's] girlfriend from running the [Civilian
Training] program saving taxpayers $68k per year."  (Doc. #55-15 at 2).  Dwyer later testified he
never heard Arteta or anyone on his campaign express "any sort of intent to eliminate the
Civilian Handgun Training Program if he were to win the nomination and become sheriff."
(Doc. #60-12 at 70–71).

      Arteta defeated Jones in the Republican primary election and went on to win the general
election.

III.    <u>Sheriff Arteta's Actions After the Election</u>

      Arteta continued to advocate for the elimination of the Civilian Training Program as
Sheriff-elect.  At a December 2022 meeting of the Republican caucus of the County Legislature,
Arteta attempted to persuade County legislators to defund both the Civilian Training Program
and the Range Supervisor position in the 2023 budget.  At the time, Arteta had not reviewed
evaluations of the Civilian Training Program, documents pertaining to its financial viability, or
evaluations of plaintiff's performance as Range Supervisor.  (Doc. #60-2 at 144–47).  He admits
he was unaware of plaintiff's responsibilities beyond overseeing the Civilian Training Program,
and testified he would not have offered her alternative employment in the OCSO if he had

---

[1]     "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case
Filing system.

succeeded in persuading the legislature to eliminate her position.  (Id. at 208–09).  Despite his efforts, Arteta was unable to convince the legislators to cancel the Civilian Training Program or defund the Range Supervisor position in the 2023 budget.

Arteta took office as Sheriff on January 1, 2023.  Once in office, plaintiff alleges Arteta began making changes to her responsibilities.  First, Arteta assigned Officer Lawrence Cottone as plaintiff's direct supervisor.  Cottone, purportedly at Arteta's direction, required plaintiff to sign in and out of work each day, revised her schedule, and eliminated the flexibility and autonomy she previously was afforded.  Arteta also ordered the locks on the range to be changed and, although he reissued keys to certain individuals requiring access to the range, he did not reissue keys to plaintiff.  Plaintiff was relieved of her supervisory authority over the two uniformed deputies she had previously overseen, and her payroll duties were reassigned to Sgt. William Cluney.

In May 2023, Arteta cancelled the Civilian Training Program.  As a result of these changes, plaintiff's working hours were reduced from fifty hours per week to forty hours per week.  However, plaintiff also received two pay raises and an increase to her benefits package after Arteta took office.

Plaintiff filed an internal grievance on February 13, 2023.  Plaintiff contends her responsibilities were greatly diminished as a result of changes instituted by Arteta and alleges Arteta unlawfully retaliated against her for engaging in constitutionally protected speech.

**DISCUSSION**

I.    Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[2]

A fact is material when it "might affect the outcome of the suit under governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes all facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor, on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

II.    Claims Against Arteta

Plaintiff brings her Section 1983 claims against Sheriff Arteta, in his individual and official capacities, based on alleged deprivations of her constitutional rights under the First Amendment.  As a threshold matter, to prevail on her claims plaintiff must show Arteta retaliated

---

[2]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

against her for protected First Amendment activity.  See Singh v. City of New York, 524 F.3d 361, 372 (2d Cir. 2008).

A.    Prima Facie First Amendment Retaliation

"To survive summary judgment on a First Amendment retaliation claim, a public employee must establish a prima facie case by bringing forth evidence showing that (1) [s]he has engaged in protected First Amendment activity, (2) [s]he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action."  Persaud v. City of New York, 2024 WL 2159852, at *3 (S.D.N.Y. May 14, 2024) (quoting Smith v. County of Suffolk, 776 F.3d 114, 118 (2d Cir. 2015)).

Plaintiff alleges defendant Arteta retaliated against her because she supported Jones's campaign for Sheriff, thereby violating her First Amendment rights to freedom of speech and association.  It is undisputed that plaintiff's involvement with Jones's campaign for Sheriff constitutes protected, First Amendment activity.  She argues she experienced adverse employment actions when Arteta assumed office because her job responsibilities were severely curtailed.  Defendants argue they are entitled to summary judgment because (i) plaintiff has not offered sufficient evidence of retaliatory, adverse employment actions which would deter a similarly situated individual, and (ii) plaintiff cannot show defendants caused any adverse employment actions she experienced.  Thus, defendants argue plaintiff cannot sustain a prima facie case of First Amendment retaliation.

The Court disagrees.

1.    Plaintiff has made a prima facie showing of an adverse employment action

In a First Amendment retaliation context, an adverse employment action is "generally characterized as a materially adverse change in the terms and conditions of employment" that

"would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006).  Such actions may range in severity from "termination of employment, . . . significantly diminished material responsibilities, or other indices unique to a particular situation," including "refusal to promote, demotion, reduction in pay, and reprimand," as well as "lesser actions [which] may also be considered adverse."  Id. at 225–26.  "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination."  Hoyt v. Andreucci, 433 F.3d 320, 328 (2d. Cir. 2006).

Plaintiff alleges she experienced a reduction of her responsibilities since Arteta assumed office, and attributes these changes to her support of Jones in the 2022 Sheriff's race. Defendants do not dispute plaintiff has experienced changes to her job responsibilities, but contend the changes do not constitute adverse employment actions because plaintiff cannot prove the conduct was retaliatory or that it would deter a similarly situated individual from exercising her constitutional rights.

Specifically, defendants contend (i) a similarly situated individual would not be deterred from participating in their significant other's political campaign, in particular when, as here, "undersheriff [Jones] was involved in [plaintiff's] hiring, promotion, and being secure in her position," (ii) because Arteta campaigned on ending the Civilian Training Program, terminating the program cannot be retaliatory, (iii) any adverse employment effects plaintiff experienced were either incidental to non-retaliatory conduct or not caused by Arteta, and (iv) plaintiff experienced positive changes to her employment after Arteta took office.  (Doc. #57 at 4–6).

These arguments are unavailing.

First, defendants argue, in essence, that plaintiff knew her job was contingent on Jones becoming Sheriff and that, as a result, she had nothing to lose in aiding his campaign. Therefore, according to defendants, "[a] similarly situated person" would not "be deterred," and thus the changes to plaintiff's position do not constitute adverse employment actions. (Doc. #57 at 5–6). The logical conclusion of defendants' position is that there is no action Arteta could take that would constitute an adverse employment action because a similarly situated individual would know their only chance of job security turned on supporting Jones's campaign and so could not be deterred. This logic is unsound. The relevant legal inquiry is whether a materially adverse change to the conditions of employment has occurred, and whether that change would deter a similarly situated individual.

Moreover, because defendants' argument turns in part on plaintiff believing an Arteta electoral victory would pose an existential threat to her job, it is undercut by the parties' dispute regarding whether Arteta campaigned on terminating the Civilian Training Program. Relying on an email Arteta sent to a supporter during the campaign, plaintiff argues Arteta campaigned on "giv[ing] the program a[n] overhaul," not on canceling it entirely. (Doc. #60-13 at 2). In further support, plaintiff points to Dwyer's testimony that he never heard Arteta or anyone on his campaign express "any sort of intent to eliminate the Civilian Handgun Training Program if he were to win the nomination and become sheriff." (Doc. #60-12 at 71). Nevertheless, defendants aver Arteta planned to terminate the program and that plaintiff was aware of Arteta's intention. In support, defendants point to a video plaintiff filmed of Jones for his campaign, which was posted on social media. The thumbnail image of the video states Arteta's true intention was to "KILL the community [Civilian Training] program!!" (Doc. #55-14 at 2; Doc. #63 ¶ 19). Whether Arteta campaigned on terminating the Civilian Training Program or not, and whether

plaintiff understood that to be one of Arteta's campaign promises, are material, disputed questions of fact that preclude summary judgment.

In addition, defendants do not dispute plaintiff experienced certain adverse actions, but contend these changes were either not retaliatory, not Arteta's doing, or were incidental side effects of legitimate, non-retaliatory actions taken by Arteta.  For instance, defendants do not dispute plaintiff's responsibilities changed after Arteta took office, cancelled the Civilian Training Program, and hired Cottone as her supervisor.  (Doc. #57 at 6–7).  Instead, defendants contend the subsequent changes to plaintiff's responsibilities were either not caused by Arteta or were incidental to his delivering on "well-reasoned" campaign promises, not retaliatory.  This argument is conclusory and conflates the standard for whether an employment action is adverse with the standard for causation.

Finally, defendants argue the changes to plaintiff's employment have not been entirely adverse, because she received two pay raises and works fewer hours since Arteta became Sheriff.  However, in this Circuit, courts must consider the "total circumstances" of the changes to the "working environment" in determining whether an employment action is adverse.  Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).  Although a reasonable jury could find plaintiff's increased pay and reduced work schedule relevant or even dispositive as to whether she suffered an adverse employment action, those facts do not, as a matter of law, preclude a finding of an adverse employment action.

At bottom, determining whether an employment action is adverse "is a heavily fact-specific, contextual determination."  Rivers v. New York City Housing Authority, 176 F. Supp. 3d 229, 244 (E.D.N.Y. 2016) (quoting Hoyt v. Andreucci, 433 F.3d at 328).  Construing the facts most favorably to plaintiff, as the non-moving party, defendants have failed to show, as a matter

of law, that plaintiff has suffered no adverse employment action.  In addition, the parties dispute

several material issues of fact regarding the changes in plaintiff's employment.  Therefore,

plaintiff has made her <u>prima</u> <u>facie</u> showing of an adverse employment action.

### 2.    Plaintiff has made a prima facie showing of causation

To establish causation, the third prong of a <u>prima</u> <u>facia</u> case of retaliation, a plaintiff must

prove the relevant decisionmaker was aware of the protected conduct which they are accused of

retaliating against.  <u>See, e.g.</u>, <u>Wrobel v. County of Erie</u>, 692 F.3d 22, 32 (2d Cir. 2012).  This is

because causation turns on "the inference that the protected speech was a substantial motivating

factor in the adverse employment action."  <u>Cotarelo v. Vill. of Sleepy Hollow Police Dep't</u>, 460

F.3d 247, 251 (2d Cir. 2006).  The inquiry is necessarily intent-focused, because retaliatory

"motive must <u>cause</u> the injury."  <u>See</u> <u>Nieves v. Bartlett</u>, 587 U.S. 391, 398 (2019) (emphasis in

original); <u>Barzilay v. City of New York</u>, 610 F. Supp. 3d 544, 573 (S.D.N.Y. 2022) ("The causal

connection must be sufficient to warrant the inference that the protected speech was a substantial

motivating factor in the adverse employment action").

Thus, a plaintiff must show a connection "sufficient to warrant the inference that the

protected speech was a substantial motivating factor in the adverse employment action" at issue.

<u>See</u> <u>Cotarelo v. Vill. of Sleepy Hollow Police Dep't</u>, 460 F.3d 247, 251 (2d Cir. 2006).  A causal

connection between the plaintiff's protected conduct and a defendant's retaliatory action can be

established "either indirectly by means of circumstantial evidence, including that the protected

speech was followed by adverse treatment, or by direct evidence of animus."  <u>Wrobel v. County</u>

<u>of Erie</u>, 692 F.3d at 32.

"In light of the court's obligation to draw all reasonable inferences against the

nonmoving party, summary judgment is rarely appropriate where the moving party's state of

mind is a material issue." <u>Allen v. W. Point-Pepperell, Inc.</u>, 908 F. Supp. 1209, 1223 (S.D.N.Y.

1995) (quoting <u>Equal Employment Opportunity Comm'n v. Home Ins. Co.</u>, 672 F.2d 252, 257

(2d Cir. 1982)).  Thus, summary judgment is often "precluded where questions regarding an

employer's motive predominate in the inquiry regarding how important a role the protected

speech played in the adverse employment decision."  <u>See, e.g.</u>, <u>Frisenda v. Incorporated Village

of Malverne</u>, 775 F.Supp.2d 486, 511, 515 (E.D.N.Y. 2011).

 Defendants fail to demonstrate no causal link exists between plaintiff's protected, First

Amendment activities and the adverse employment actions she experienced.  They contend the

changes to plaintiff's job were either not caused by Arteta or were incidental to decisions he

undertook for non-retaliatory purposes.  For instance, defendants argue Arteta's decision to end

the Civilian Training Program was not retaliatory, but "well-reasoned," and that any changes to

plaintiff's employment arising from the termination of the program are incidental.  (Doc. #57 at

7).  This is insufficient to prevail on summary judgment.

 As discussed, Arteta's motivation in terminating the program is not only disputed, but

also one of the central questions of material fact.  Moreover, plaintiff's allegations are not

limited to the termination of the Civilian Training Program but also include adverse effects to her

job responsibilities.  (Doc. #60-21 at 3).  In response, defendants aver any changes plaintiff

experienced beyond the termination of the Civilian Training Program were "not determined and

directed by Arteta, but by an officer under him without his input."  (Doc. #57 at 7).  Yet this is

belied by Arteta's own testimony that he personally influenced or instructed plaintiff's

supervising officer, Cottone, to make changes to plaintiff's schedule flexibility and job

responsibilities.  (Doc. #60-2 at 174–80).

In addition, plaintiff has offered direct and circumstantial, non-conclusory evidence of causation sufficient to demonstrate genuine issues of fact exist which are material to causation and preclude summary judgment.  Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004).  For example, plaintiff relies on Arteta's own admission that he had "animous [sic] toward Mr. Jones" and he "associate[d] Miss Thomas closely with Mr. Jones."  (Doc. 60-2 at 211–12).  Plaintiff also points to a comment posted by Dwyer under a Jones campaign video claiming that what Arteta meant by "overhauling" the Civilian Training Program was that he would "fire [Jones's] girlfriend from running the [Civilian Training] program saving taxpayers $68k per year."  (Doc. #55-15 at 2).  Although Dwyer testified he posted this particular comment without consulting Arteta (Doc. #60-12 at 73), Arteta testified Dwyer and other campaign consultants "would speak for [him]" (Doc. #60-2 at 123).

In addition, plaintiff contends "[t]he sequence of events and temporal proximity is also probative" of Arteta's intent.  (Doc. #64 at 21).  Before taking office, Arteta unsuccessfully attempted to enlist the County Legislature in defunding plaintiff's role within the 2023 budget.  Arteta admits he undertook this effort without fully reviewing the Range Supervisor's responsibilities, plaintiff's performance evaluations, or the financial viability of the Civilian Training Program.  After Arteta assumed office, plaintiff alleges he set about limiting her responsibilities and directed others to do the same.

Whether circumstantial evidence is sufficient to show causality "depends on the circumstances of each case."  Wrobel v. County of Erie, 692 F.3d at 32.  Crucially, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  Gorman–Bakos v. Cornell Coop.

Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001).  But when, as here, the

sufficiency of such circumstantial evidence turns on the credibility of a party's testimony, it is

the province of the jury to make the assessment.  See Fincher v. Depository Tr. & Clearing

Corp., 604 F.3d 712, 725–26 (2d Cir. 2010).

Plaintiff has offered sufficient evidence to raise genuine issues of material fact on

causation, regarding Arteta's intent.  A reasonable jury could conclude Arteta directed the

changes to plaintiff's job responsibilities because of his animus towards Jones and Arteta's

admission that he associated plaintiff with Jones's campaign for Sheriff.

Accordingly, plaintiff has satisfied her burden of establishing a prima facia case of First

Amendment retaliation.

B.    Affirmative Defenses

"Once the plaintiff makes out a prima facie retaliation claim, a government defendant

may still receive summary judgment if it establishes its entitlement to a relevant defense."  Smith

v. County of Suffolk, 776 F.3d at 119.  Defendants ask the Court to grant summary judgment

because they are entitled to an affirmative defense as a matter of law.

First, defendants argue they are entitled to an affirmative defense pursuant to Mt. Healthy

School Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274 (1977) ("Mt. Healthy"), because Arteta would

have taken the same actions regardless of whether plaintiff supported Jones's campaign.  In the

alternative, defendants argue Arteta is entitled to qualified immunity.

The Court disagrees.

1.    Mt. Healthy Defense

To establish a Mt. Healthy defense, defendants must show "by a preponderance of the

evidence that [the defendant] would have reached the same decision as to [the adverse

14

employment action] even in the absence of the protected [First Amendment] conduct." Mt. Healthy School Dist. Bd. Of Educ. v. Doyle, 429 U.S. at 287. To overcome the defense, a plaintiff must demonstrate the allegedly retaliatory motive was a "but-for" cause of the adverse action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." Persaud v. City of New York, 2024 WL 2159852, at *5.

A Mt. Healthy defense presents a high bar at summary judgement. Where "sufficient circumstantial evidence exists from which a reasonable jury could infer [the adverse employment action] was primarily, if not entirely, based on the protected [conduct]," summary judgment is not appropriate. Smith v. Suffolk County, 776 F.3d at 124. Thus, if the evidence "permits only inferences," those inferences necessarily "may be drawn in either party's favor," and "[the Court] require[s] more than inferences from an employer seeking summary judgment based on the Mount Healthy defense." Id. at 125.

To prevail on a Mt. Healthy defense at this stage, defendants must "show that a reasonable jury would have to find by a preponderance of the evidence" that Arteta would have taken the same actions even if plaintiff had not supported Jones's campaign. Nagle v. Marron, 663 F.3d 100, 112 (2d Cir. 2011) (emphasis added). In advancing this argument, defendants focus on plaintiff's duties with respect to the Civilian Training Program. They argue that because Arteta purportedly campaigned on ending the program, the reduction in plaintiff's responsibilities was no more than an inevitable consequence of Arteta delivering on his campaign promises. Moreover, defendants point out plaintiff was far from the sole OCSO employee who experienced changes to their responsibilities as a result of Arteta fulfilling his promise. Specifically, defendants point to the reassignment of the two deputies plaintiff

15

supervised prior to Arteta becoming Sheriff.  Both officers were reassigned upon the termination of the Civilian Training Program even though neither supported Jones's campaign.

Yet plaintiff argues a jury could find Arteta was motivated by retaliatory animus based on the evidence in the record, thereby precluding a Mt. Healthy defense.  The Court agrees.

Although a reasonable jury could conclude the reassignment of plaintiff's subordinates demonstrates a lack of specific retaliatory animus towards plaintiff, that is insufficient at summary judgment to support the inference that Arteta would have taken the same actions even if plaintiff had not supported Jones's campaign.  In particular, defendants' argument neglects the reduction of plaintiff's other responsibilities as Range Supervisor, separate and apart from her responsibilities tied to the Civilian Training Program.  A reasonable jury, therefore, need not conclude Arteta would have taken adverse employment actions against plaintiff in the absence of her protected First Amendment conduct.

Accordingly, defendants have not met their burden with respect to the Mt. Healthy defense at this stage.

### 2. Qualified Immunity

Defendants next argue Arteta is entitled to summary judgment on qualified immunity grounds.

The Court disagrees.

Qualified immunity shields government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Locurto v. Safir, 264 F.3d 154, 162 (2d Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "Summary judgment may be granted on this ground if the defendant shows that (1) the asserted right was not clearly established, or (2) it was nonetheless

objectively reasonable for the official to believe the conduct did not violate it." Bussey v. Phillips, 419 F. Supp. 2d 569, 588 (S.D.N.Y. 2006).

However, "[w]here [the] specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate." Garcia v. Watts, 2013 WL 599750, at *8 (S.D.N.Y. Feb. 15, 2013) (quoting Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003)). The instant case concerns a "motive-based constitutional tort[]," thus Arteta's "subjective intent is indeed relevant." Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003). Moreover, as previously discussed, plaintiff has demonstrated material issues of fact exist regarding Arteta's retaliatory intent. Plaintiff's First Amendment retaliation claims turn on Arteta's specific intent because whether "retaliatory motive" exists and is the "but-for" cause of the alleged injury is at the heart of the causation inquiry. Galgano v. Countya. of Putnam, New York, 2024 WL 1623401, at *104 (S.D.N.Y. Apr. 15, 2024). Because Arteta's specific intent is an essential element of plaintiff's claims, and because plaintiff has demonstrated material factual issues predominate that inquiry, summary judgment is inappropriate.

To be clear, the Court is not ruling on whether Arteta is entitled to qualified immunity as a matter of law, and he may raise the issue at trial. In re State Police Litigation, 88 F.3d 111, 122 (2d Cir. 1996); Tolbert v. Queens Coll., 164 F.3d 132, 138 (2d Cir. 1999).

Accordingly, Arteta's motion for summary judgment on qualified immunity grounds must be denied.

III.    <u>Claims Against Orange County</u>

The County argues plaintiff's Section 1983 claims against it must be dismissed because plaintiff has not demonstrated the alleged adverse employment actions in this case were taken as part of an unconstitutional municipal policy, practice, or custom, pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978) ("<u>Monell</u>").

The Court disagrees.

The <u>Monell</u> framework shields municipalities from vicarious liability arising from the conduct of all employees.  Thus, under <u>Monell</u>, a municipality is only liable "when execution of a government's policy . . . inflicts the [plaintiff's] injury."  436 U.S. at 694.  Therefore, to prevail on a claim against a municipality, a plaintiff must allege her injury were caused by municipal custom, policy, or usage.  <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 80–81 (2d Cir. 2012).  Of relevance here, a "policy" includes "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question."  <u>Brandon v. City of New York</u>, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010).  In other words, a municipality is liable, under <u>Monell</u>, for the actions of its final policymakers.  <u>Nagle v. Marron</u>, 663 F.3d at 116–17.

A final policy maker "is someone whose edicts or acts may fairly be said to represent official policy for the entire municipality."  <u>Agosto v. New York City Dep't of Educ.</u>, 982 F.3d 86, 98 (2d Cir. 2020).  "When an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy" and he is a final policy maker.  <u>Nagle v. Marron</u>, 663 F.3d at 116.  "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law" and therefore must be resolved by the Court prior to submitting the case to the jury.  <u>Jeffes</u>

18

v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).  Moreover, "the official in question need not be a municipal policymaker for all purposes.  Rather, . . . he must be responsible under state law for making policy in that area" giving rise to the challenged conduct.  Id. (emphasis in original).  Even "a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate [liability for] the municipality."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004).

The Second Circuit has considered several factors when determining whether an official is a final policymaker, including whether the official holds a high position, whether he supervises a significant number of subordinates, and whether he has final authority over personnel decisions.  Rookard v. Health & Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983).  "An official's title, though not dispositive . . . is relevant," and an official is considered to have final authority over personnel decisions if they order an employment action and that action occurs.  Id.  In addition, municipalities can be held liable for the actions of lower-level officials if a final policymaker "approved a subordinate's decision and the basis for it."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004).

A.    Sheriff Arteta Is a Final Policymaker

Defendants argue the County is entitled to summary judgment because "there [is] no proof the alleged adverse employment actions were performed pursuant to any County policy or custom."  (Doc. #57 at 10–11).  Defendants contend the adverse employment actions plaintiff alleges were either (i) caused by Cottone's actions, not Arteta's, or (ii) occurred prior to Arteta assuming office, when he was not a final policymaker for the County.  (Doc. #57 at 10–11).

Defendants' arguments are misplaced.  With respect to OCSO, Arteta is indisputably the final policymaker for the County.  Indeed, he testified he is "the final policymaker with respect

to personnel employment decisions in the [County] sheriff's office."  (Doc. 60-2 at 229).

Further, Section 17.03 of the County Charter grants the Sheriff final authority over OCSO on all

matters not reserved to the County legislature.  Orange County Charter § 17.03.  In addition, the

County Charter states "[t]he Sheriff shall have the power to appoint an Undersheriff and such

Deputy Sheriffs, assistants and employees of his office as shall be authorized by the County

Legislature," and provides that these personnel "shall be directly responsible to, and serve at the

pleasure of, the Sheriff."  Orange County Charter § 17.03.

Even if, as defendants assert, a number of the alleged adverse employment actions were

directed by Cottone, Arteta's "acquiescence in unconstitutional retaliation could be inferred from

his tolerance and encouragement of harassment of plaintiff."  Jeffes v. Barnes, 208 F.3d at 63.

Arteta all but admits his tolerance of any actions Cottone may have taken without his direction.

He testified he became aware of plaintiff's internal grievance almost immediately after she filed

it, and he did not attempt to get Cottone to amend any of his decisions as a result.  Further, the

existence of a grievance process does not vitiate a defendant's status as a final policymaker.  See

Runyon v. New York City Transit Auth., 2002 WL 31093609 at *5 (S.D.N.Y. Sept. 18, 2002).

Defendants also attempt to argue that some of the alleged adverse employment actions

occurred before Arteta took office as Sheriff, and the County is therefore not liable for any of

Arteta's actions.  While the record reflects Arteta did take some actions before he assumed

office, defendants do not discuss the evidence with respect to any of the alleged adverse

employment actions that occurred after Arteta took office.

The County cannot escape liability under Monell.  Arteta is the final policymaker for the

Sheriff's office as a matter of law.  Accordingly, defendants' motion for summary judgment as to

plaintiff's claims against Orange County must be denied.

**CONCLUSION**

The motion for summary judgment is DENIED.

The Court will conduct a case management conference on <u>October 22, 2025, at 11:00</u> <u>a.m.,</u> to be held in person at the White Plains courthouse, Courtroom 620, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will continue to make to settle this case.  To be clear, counsel are directed to discuss settlement in good faith prior to that date.

The Clerk is instructed to terminate the motion. (Doc. #54).

Dated:  September 22, 2025
        White Plains, NY

                                SO ORDERED:

                                Vincent L. Briccetti
                                United States District Judge

21